(No. 77-CC-2404– )

DAVID W. DOUGLAS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 19, 1989.*

GOLDENHERSH & GOLDENHERSH, for Claimant.

NEIL F. HARTIGAN, Attorney General (JAMES C. MAJORS, Assistant Attorney General, of counsel), for Respondent.

BURKE, J.

This cause coming to be heard upon the report of the Commissioner, after hearing before said Commissioner and this Court being fully advised in the premises,

Finds that Claimant was injured on July 26, 1976, while he was an inmate at the Menard Correctional Center and while he was working as a farm hand at that facility. Claimant brought this action to recover for personal injuries he alleges were caused by the negligence of the employees of the State of Illinois, pursuant to section 8(d) of the Court of Claims Act (Ill. Rev. Stat. 1985, ch. 37, par. 439.8(d)).

Claimant is presently 39 years of age. He resides in Granite City, Illinois, and has worked as a crane operator at Midwest Steel in Granite City since March 1980. He grew up on his parents' farm in Madison County and began operating farm equipment and machinery regularly while still a child. In July 1970, Claimant pleaded guilty to a murder charge and was sentenced to Menard Correctional Center.

During 1976, Claimant was working on the farm at the prison. Early in July, he operated one of the farm tractors as part of his regular work. The tractor had as a part of its equipment a device known as a power-take-off (PTO) unit. This device delivered power from the tractor's engine to any piece of equipment attached to the rear of the tractor. The PTO contained a gear to engage and disengage the power drive. Turning off the tractor engine, of course, also shut off the PTO. During the time Claimant was operating the tractor, he experienced trouble with the PTO in that the gear lever failed to engage and disengage the power train.

Claimant reported this condition to two officers at

the prison farm, who then confirmed the condition. The officers and Claimant reported this to Allen Gale, the assistant supervisor of the farm. The suggestion was made to Gale that the PTO needed repair. Several days later Claimant reminded Gale of the problem with the PTO and was directed by Gale to take the tractor to the farm garage for repairs. According to Claimant, the garage employees refused to make any repairs and advised Claimant to continue using the tractor in its then present condition.

Finally, Claimant stated that he was instructed by Gale to never shut off the tractor's engine while he was performing his work on the farm unless Claimant actually was leaving the tractor unused for at least 30 minutes. Gale's reason, according to Claimant, was that it was less expensive to allow the tractor to continue to idle than it was to stop and restart the engine after a short time.

On July 26, 1976, Claimant was directed by Gale to attach a large baler to the tractor in question and to bale straw in one of the farm fields. The baler was attached to the tractor's PTO. The baler contained large metal teeth which faced the front of the baler just behind the tractor. The teeth picked up the straw, and two rollers behind the teeth directed the straw into the baler, where the straw was packed into a large cylinder of straw and then was deposited behind the equipment.

Claimant began experiencing trouble with the baler rollers. Claimant stopped the tractor and disengaged the PTO gear. He left the tractor engine idling. After examining the baler, Claimant determined that several belts in the machinery were twisted. He fixed the belts and went to the front of the baler to examine the teeth and pick-up area. Without warning the PTO engaged

and began operating the rollers and other machinery in the baler. Claimant's initial reaction was surprise. He stood up behind the tractor and reached for the lever that operated the gear to disengage the PTO. While reaching, Claimant slipped, and his left hand landed on one of the rotating pick-up reels on the front of the baler drawing his hand into the machine and between the two rollers. The result was that Claimant's left hand was badly burned and scraped on the back of the hand. The skin was burned off.

Claimant was treated initially at Chester Memorial Hospital. He underwent surgery to graft skin onto his hand. All of the expenses for this medical treatment were paid by the State.

Claimant was released from prison in the spring of 1979. He first worked for his father in the sheet metal business and later became employed at Midwest Steel. He continued to experience problems with his hand injury and sought new medical care. He was referred to Dr. Joseph Eades, a specialist in plastic surgery at Jewish Hospital in St. Louis, Missouri.

Dr. Eades first examined Claimant in July 1980. He found that Claimant's injury did not heal properly. In October 1980, Dr. Eades attached skin from Claimant's abdomen to the wound area. This procedure required Claimant's hand to be attached to his abdomen for about 45 days to allow live skin to grow on the hand. Thereafter, several additional surgeries were required to complete the process. Claimant was released from Dr. Eades' care in April 1982.

Claimant testified that he suffered substantial pain after the accident and continued to suffer until Dr. Eades released him. He described the pain during the time his hand was attached to his abdomen as quite

severe. He testified that he has limited strength, cannot make a complete fist and has less than full feeling in his left hand. He also experiences increased discomfort when exposed to cold. Claimant is right-handed and admits that he is able to perform most of his work tasks without difficulty or limitation.

Claimant lost wages of $8,750 during his treatment under Dr. Eades. Claimant's total medical expenses were $21,000, of which all but $750 was paid by the State or by insurance coverage. Claimant filed a medical malpractice claim against the physician in Chester Memorial Hospital who initially treated him. This claim was settled for $6,000. Claimant's life expectancy is stipulated to be 78 years. He was 26 years old on the date of the accident.

Allen Gale testified that on the date of Claimant's injury, he was the farm supervisor at Menard Correctional Center. Claimant had been selected to work on the farm at Menard because of his farm experience and worked there for about a year prior to the accident. Gale worked with Claimant during that time. Claimant operated all the farm equipment and did minor repairs on the equipment, including the baler on which Claimant was injured. The baler had several warning signs attached which advised of the dangerous nature of the equipment and which further directed that the tractor engine be shut off before the operator performed any work on the equipment. Gale stated further that he warned Claimant never to attempt to unclog the baler from the front, where the straw or hay was drawn into the baler, but only from the rear, and only after both the PTO and tractor engine were shut off. Gale neither admitted nor denied specifically that he directed Claimant or anyone else to leave the tractor engine running unless it was not to be used for 30 minutes or more.

The State owes a duty to an inmate of its penal institutions to provide that inmate with safe conditions under which to perform the work assigned to him (*Reddock v. State* (1978), 32 Ill. Ct. Cl. 611); a further duty to supervise the work of an inmate and to provide safe and adequate work equipment (*Hughes v. State* (1984), 37 Ill. Ct. Cl. 251.) The State breached its duties to Claimant by requiring Claimant to work with a tractor whose PTO unit was known to be defective and dangerous. This breach of duty by the State constitutes negligence which was a proximate cause of Claimant's hand injuries.

The State asserts that Claimant was contributorily negligent by not turning off the tractor engine before attempting to repair the baler belts and by positioning himself in front of the baler while the engine was running. This Court has recognized that an inmate does not have the liberty of choice available to a person in private industry and must work under the conditions assigned to him. He is required to take orders without objections and does not possess the freedom of choice inherent in the doctrines of assumption of risk and contributory negligence. (*Moore v. State* (1952), 21 Ill. Ct. Cl. 282; *Reddock v. State* (1978), 32 Ill. Ct. Cl. 611.) However, with the advent of comparative negligence, the Court has looked at the conditions under which an inmate acts in the face of known danger to determine if any contributory negligence should be assessed.

In *Reddock*, Claimant was specifically ordered to use a grinding machine which was defective and dangerous and whose condition was known to supervisory officers. Claimant was injured while operating the machine in a normal manner.

In *Hughes, supra,* and in *Burns v. State* (1982), 35 Ill.

Ct. Cl. 782, the Claimants were directed to work in conditions which were hazardous and without adequate protection or supervision, but in each case the Claimant performed an extra activity which was the ultimate cause that led to the injury from the dangerous condition. Whereas in *Reddock*, Claimant simply did his work on the dangerous machine as ordered and committed no additional negligent act, in *Hughes*, Claimant actually placed his hand in an area he could have avoided and thereby was injured in the dangerous activity. In *Burns*, Claimant carelessly reached into a dangerous area without looking and was injured because of the unsafe condition and lack of adequate safety equipment. Claimant in the instant case performed the voluntary acts of not turning off the tractor engine and of positioning himself where he knew he would be in danger from the PTO unit in the event the baler began operating, aggravated the dangerous condition created by the State's negligence, and must therefore be found guilty of contributory negligence to be compared to that of the State. It is found that Claimant was 40% negligent.

The value of Claimant's injury is $90,000. This total must be reduced by Claimant's 40% comparative negligence to $54,000. Since the State is entitled by statute to have this award further reduced by other recoveries to Claimant under section 26 of the Court of Claims Act (Ill. Rev. Stat. 1987, ch. 37, par. 439.24—6), the $54,000 shall be reduced as follows:

(A) $6,000 which Claimant received in settlement of his medical malpractice claim; and

(B) $20,250, the amount of Claimant's medical expenses which were paid by the State or by other sources.

It is hereby ordered that an award of $28,750 is

36

hereby entered in favor of Claimant, said award being in full and complete satisfaction of Claimant's complaint.